### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO

KENDRA MORRISON,

        **Plaintiff,**

vs.                                         **CIV No. 12-143 JCH/RHS**

LOS LUNAS PUBLIC SCHOOLS and
BOARD OF DIRECTORS OF THE
LOS LUNAS PUBLIC SCHOOLS,

        **Defendants.**

*CONSOLIDATED WITH:*

BOARD OF EDUCATION OF THE
LOS LUNAS PUBLIC SCHOOLS,

        **Plaintiff,**

                                       **CIV No. 12-146 JCH/RHS**

vs.

KENDRA MORRISON,

        **Defendant.**

### <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on Los Lunas Public Schools' ("LLPS's") and the

Board of Directors of LLPS's (collectively, "the District's")[1] *Motion for Summary Judgment*

(Doc. 29) in an action that consolidates two related suits.  In the first suit, Kendra Morrison

seeks reimbursement of attorneys' fees and costs she incurred in prevailing against the District at

an administrative due process proceeding she initiated on behalf of her minor son, A.M.,

---

[1]As shown in the caption, Kendra Morrison initially filed suit against LLPS and its Board of Directors as two separate entities; a third entity, the Board of Education of LLPS, then brought the related suit.  The Court follows the lead of the parties in collectively referring to all three entities as "the District."

pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i)(3).  In the second suit, the District appeals several rulings made by the Due Process Hearing Officer ("DPHO") following the proceeding: (1) that the District violated A.M.'s procedural rights under the IDEA by failing to evaluate him for "emotional disturbance," a disability under the Act; (2) the District violated A.M.'s substantive right to a free appropriate public education ("FAPE") by failing to find that A.M. suffered from two disabilities – emotional disturbance and "other health impairment (Attention Deficit Hyperactivity Disorder)," and, consequently, that (3) the District further violated A.M.'s right to a FAPE by failing to provide him with special education services targeted to meet his unique needs.

In support of the instant motion, the District argues that the DPHO's findings cannot survive the modified *de novo* standard of review that applies when a federal district court reviews an administrative decision on an IDEA petition.  The Court, having considered the motion, briefs, extensive administrative record, and relevant law, and being otherwise fully informed, finds that the DPHO's decision should be affirmed, and thus, that the District's motion should be denied.

## FACTUAL BACKGROUND

At the time Morrison requested a due process hearing on his behalf in June 2011,  A.M had recently completed his seventh-grade year at Los Lunas Middle School in the District.  A.M. has a lengthy history of mental health evaluation by the District and other independent professionals, as summarized herein.

### A.M's Early Evaluation as Developmentally Delayed, With Behavioral Issues

A.M. was first identified as requiring special education as a pre-school student in 2002,

when he was found to be developmentally delayed in language skills, and experiencing difficulties with social behavior, attention, and communication.   A.M.'s pre-school thus convened a team to develop an individualized education program (IEP) for him,[2] and he began receiving special services in these areas.

Upon his transition to kindergarten in 2003, A.M.'s language services were slightly reduced by his IEP team.  His IEP was altered again in 2004, with certain services eliminated from his program altogether.  Over the course of 2004, several IEP team meetings were held to discuss A.M.'s progress, and it was found that he was improving in several areas and demonstrating strong academic skills.

### District's First Psychological Evaluation in 2005: ADHD, Emotionally Disturbed Behavior, No Disability

In 2005, the District's psychologist, Dr. Katherine Bradley-Askren, conducted a comprehensive psychological evaluation of A.M, which culminated in the release of a 34-page report on November 28, 2005.  Bradley-Askren noted in the report that A.M. was performing above his second-grade level in all academic areas, and that his cognitive and academic abilities were in the above-average to superior range, but that he did not qualify as gifted.  The report further noted that A.M.'s IEP team had developed an Alternative Behavior Plan in 2005 to help

---

[2]"IDEA provides federal funding to states to assist with the education of disabled children on the condition that states comply with the Act's extensive goals and procedures," including providing all eligible students with a FAPE, which includes an IEP. *Jefferson County Sch. v. Elizabeth E.,* 702 F.3d 1227, 1229 (10th Cir. 2012) (quotation omitted).  An IEP "is a detailed written document which describes the student's educational goals for an academic year and establishes a plan to achieve those goals." *Id.* at 1230; 20 U.S.C. § 1414(d)(1)(A)(I).  The IDEA "sets forth detailed procedures through which an IEP is to be developed with the participation of the child's parents, teachers, special education teachers, school officials, and other parties with knowledge of the child's special needs," who constitute the "IEP team."  *Id.; see also* 20 U.S.C. § 1414(d).

him address some interpersonal issues and develop social skills.  Bradley-Askren indicated that

A.M. was experiencing a sibling rivalry with his sister at home; that his parents had been briefly

separated when A.M. was in kindergarten, but subsequently reconciled; and that he displayed

behaviors consistent with Attention Deficit Hyperactivity Disorder ("ADHD") and "some

clinically significant behaviors which could fit with the exceptionality of emotionally disturbed,"

but did not meet all the criteria to qualify as emotionally disturbed under the IDEA.  She further

concluded that A.M. did not qualify for a specific learning disability or other health impairment.

**<u>Reduction of A.M.'s Special Education Services and Subsequent Identification as a Gifted Student</u>**

On January 24, 2006, Kathleen Eisenbrown, a licensed social worker at A.M.'s

elementary school, completed a Social Worker Services Assessment Form for him.  She noted

that A.M. would cry, yell, hit, spit, and "shut down" in the classroom – behaviors that "have

made his peers want to stay away from him," but that his behavioral issues were not interfering

with his acquiring new academic skills.  (AR at 1038).

On February 3, 2006, Morrison wrote to the District expressing her disagreement with

the decision to discontinue A.M.'s receipt of certain special education services, and requesting

that he be independently evaluated for special education eligibility.  The District responded by

taking the necessary steps to have A.M. independently evaluated.

In March 2006, A.M. was identified as academically gifted by a Multidisciplinary

Evaluation Team for the District and began receiving services suited to his new designation.

On May 16, 2008, the District developed a new IEP for A.M.  Morrison disagreed with

certain unspecified aspects of the plan, and continued to have concerns about the adequacy of the

services provided to A.M., amid "his increasing anxiety and reports of poor social interactions

with peers, including bullying." (Doc. 33 at 16).

On January 28, 2009, Tom House, Recreational Therapist for the District, completed a Recreation Therapy Report for A.M., which found that he was making progress in the area of understanding boundaries, following directions, and developing age-appropriate strategies for dealing with frustrations, problem solving, decision making, and anger management.

**First Independent Evaluation in 2009: ADHD, Communication Disorder, and Suicidal Thoughts**

On December 3, 2008, the District agreed to pay for a new independent evaluation and social work evaluation of A.M. Morrison requested that the former evaluation be performed by Dr. Betsy Williams and the latter by Chris Acklen, a licensed social worker.

Acklen evaluated A.M. in Spring 2009, and reported that he was experiencing emotional sensitivity, low frustration tolerance, and diminished self-esteem, and reported being bullied on the schoolyard before and after school.

On May 5, 2009, Williams performed an independent neurobehavioral evaluation of A.M.[3] Williams found that A.M. had ADHD, combined hyperactive and inattentive; communication disorder NOS (not otherwise specified); and developmental communication disorder. Williams reported that A.M. was impulsive and had difficulties with mental flexibility, self-monitoring, and attending to instructions, though he scored in the average to superior range in cognitive abilities. She further noted that A.M. had experienced suicidal thoughts when frustrated and had been bullied by peers. While Williams did not speak to any of A.M.'s

---

[3]Williams refused to comply with the District's requirement that she submit to a background check prior to working with A.M., and the parties dispute whether a background check was required by New Mexico law. However, it is undisputed that the due process hearing officer qualified Dr. Williams as an expert in school psychology and clinical neuropsychology.

teachers in creating her report, she did review records and reports obtained from them in noting that A.M. had trouble in the classroom with fidgeting, listening, following instructions, and sustaining attention, which adversely affected both his class work and his interaction with peers. Williams concluded that intensive intervention on A.M.'s behalf was needed.

### Second District Evaluation in 2009: A.M. Not Gifted, Otherwise Ineligible for Special Education

District psychologist Dr. Bradley-Askren evaluated A.M. for a second time in October 2009.  In her October 8, 2009 report, Bradley-Askren reviewed Dr. Williams' May 2009 assessment and all A.M.'s previous records in concluding that A.M.'s academic performance was at or above grade level, that he no longer qualified for designation as a gifted student, and that he did not meet the criteria for a specific learning disability.  She further noted that A.M. had previously been diagnosed with ADHD; that, during testing, A.M. fidgeted with a toy and seemed lethargic; that his mother was concerned that A.M. preferred to be alone, had difficulty making friends, and could not understand why other children were mean to him; and that during two separate classroom observations his behavior did not, in Bradley-Askren's view, appear markedly different from that of his peers for the majority of the time.  The report did not specifically address or evaluate whether the exceptionality of a serious emotional disability was applicable to A.M.

On October 27, 2009, the Multidisplinary Evaluation Team convened to discuss the recent evaluations of A.M.  The Team acknowledged A.M.'s difficulties functioning, maintaining attention in class, and relating to peers, but concluded that A.M. was performing academically at or above his grade level; that ADHD was not impacting his education; and that he was not eligible for any further special education services.  The Team did not address the

issue of whether A.M. had a serious emotional disturbance.

Following the Multidisciplinary Evaluation Team's eligibility determination, A.M. was exited from his school's gifted program.

After Morrison continued to raise concerns about A.M.'s need for special education services, the District arranged for another evaluation of A.M.  On February 4, 2010, an IEP Team found that A.M. was ineligible for special education services.

### Second Independent Evaluation in April 2010: ADHD; Communication, Oppositional, and Developmental Coordination Disorders

On April 17, 2010, A.M. was independently evaluated by Dr. Lorraine Freedle – who has degrees in psychology, social work, and school psychology, and an advanced degree in clinical psychology – at Morrison's request.  Freedle confirmed Bradley-Askren's earlier diagnosis of ADHD;  further diagnosed A.M. with Oppositional Defiant Disorder, Communication Disorder NOS, and Developmental Coordination Disorder NOS; and noted that he was experiencing unspecified developmental delays with emotional and behavioral problems.  She did not address the issue of whether A.M. was emotionally disturbed within the meaning of the IDEA.  Freedle noted that A.M.'s parents were going through a divorce, which had been difficult for him; that he had problems with focusing, peer relationships, and self-regulation; and that he could not cope with stress, as evinced by his crying in the classroom, frequent trips to the school nurse's office, and expression of suicidal thoughts.  Freedle found that A.M. was not merely socially maladjusted as defined by the IDEA.

Prior to performing her evaluation, Freedle reviewed many of A.M.'s records, but did not review his academic records or evaluate him in a classroom environment.

**District Finds A.M. Ineligible For Section 504 Special Education Services**

On May 19, 2010, the District convened a meeting pursuant to Section 504 of the Rehabilitation Act of 1973 to determine whether A.M. was entitled to special education services under the statute.[4]  Twenty-five school staff members and family members attended, including Morrison, who contended that A.M. was in need of supports under Section 504.  However, it was determined that A.M. was not eligible for Section 504 services.

Over the course of the 2009-2010 school year, A.M. went to the school nurse's office 43 times, typically complaining of stress, stomachaches, headaches, and cramps.  These visits resulted in A.M.'s missing approximately 22 hours of classroom time over the course of the year.

**Third Independent Evaluation in June 2010: Adjustment/Communication Disorders, ADHD**

In June 2010, A.M. began treatment with clinical psychologist Dr. Thomas Sims, who has experience developing IEPs with the District.  Sims found that A.M. was experiencing an adjustment disorder with mixed anxiety and increasing depression involving sleep and appetite disturbances, deteriorating relationships marked by bullying, and "a sense of hopelessness regarding his ability to meet academic and social expectations unless he receives more individual attention and instructional techniques as previously recommended," complicated by ADHD and

---

[4]"Section 504 protects individuals with disabilities from discrimination in a variety of programs and activities receiving federal financial assistance, including public elementary and secondary education programs." *Kimble v. Douglas County Sch. Dist. Re-1,* 2013 U.S. Dist. LEXIS 25264, at *10 (D. Colo., Feb. 25, 2012); *see also* 29 U.S.C. § 794(a). "[T]he substantive content of Section 504 as applied to a child's education is similar to that of the IDEA, [though] Section 504 has a wider scope." *Id.*  Thus, because "the definition of 'individual with a disability' under Section 504 . . . is broader than the definition of a 'child with [a] disabilit[y]' under the IDEA . . .  the group of students eligible for IDEA protection is a subset of the group eligible for protection under Section 504." *Id.* (citations omitted).

communication and coordination disorders.  (AR at 388).  In an October 2010 treatment note, he

suggested that appropriate intervention for A.M. include educational and behavioral

interventions at home and school, in addition to his ongoing therapy.

### District Stages Suicide Intervention for A.M.; Conducts Second 504 Meeting and Finds No Disability

In September 2010, A.M. was verbalizing suicidal thoughts at school and to his therapist,

Dr. Sims.  He was further observed to be socially withdrawn, neglecting his school work,

scratching himself, crying, and angry about ongoing bullying by peers.  The District responded

by contacting police and emergency medical personnel and then conducting an intervention for

A.M., at which he signed a "no suicide contract."  The District's suicide intervention interviewer

found that A.M. had pressure at school from bullies, felt hopeless, was neglecting his school

work, was withdrawn and unwilling to communicate, had a tendency to cry, had unusual

thoughts and perceptions, and self-mutilated by scratching.

In the wake of A.M.'s suicidal threats, District officials further reported Morrison to the

New Mexico Children, Youth, and Families Department ("CYFD") for possible child neglect.

On October 25, 2010, CYFD issued a finding that the report was unsubstantiated.

On October 23, 2010, A.M.'s pediatrician, Dr. Steve Cohen, wrote to the District

reiterating that A.M. had been diagnosed with ADHD and requesting a new IEP for him.  Three

days later, on October 26, 2010, the District held a second "Section 504 meeting," at which it

was again concluded that A.M. did not qualify for special education services under the

Rehabilitation Act.

On November 2, 2010, Morrison requested that A.M.'s eligibility for special education

services and supports be reassessed.  The District denied the request, citing its previous findings

regarding A.M.'s ineligibility for such services.

### District Evaluations, 2010-2011: Anxiety, Depression, Negative Social Interactions, Bullying, Increased Absences

On November 14, 2010, the District held a Student Assistance Meeting for A.M., attended by, *inter alia,* his middle school principal, the school nurse, and his parents.  The team noted that A.M. was experiencing anxiety and depression, which had resulted in increased absences from school and visits to the school nurse's office.

Following the meeting, A.M. was referred to the District's Behavior Specialist, Deborah Coker, for a Functional Behavior Assessment ("FBA"), which took place on or shortly after January 18, 2011.  In conducting the FBA, Coker observed A.M. in the school setting and concluded that he frequently exhibited anxiety and attention-seeking behavior in the classroom, missed school assignments, and experienced negative social interactions with peers and adults, including one incident during which other children laughed and made negative comments towards him, which culminated in his crying in the nurses' office for over two hours.

On March 29, 2011, Morrison notified the District that A.M. was being bullied by his peers during school hours.  On April 15, 2011, the District responded that the school was a safe environment for A.M.

Over the course of the 2010-2011 school year, A.M. went to the school nurse's office 103 times, which resulted in his missing approximately 139 hours of classroom time.

On October 13, 2011, A.M. was removed from school due to anxiety attacks.

## PROCEDURAL HISTORY

On or about June 3, 2011, Morrison, through counsel, filed a request for a due process hearing with the New Mexico Public Education Department ("NMPED").  In her complaint,

Morrison cited, *inter alia,* the District's "ignor[ing] information about A.M.'s eligibility for special education in connection with ADHD and a communication disorder ,"(AR at 7), including the diagnoses of Drs. Williams, Freedle, and Sims, and A.M.'s history of suicidal ideation as bases for her position that the District's failure to identify A.M. as a student eligible for receipt of special education under the IDEA violated his right to a FAPE.

From November 1 - November 4, 2011, the NMPED  held a due process hearing at which A.M., Morrison, various of A.M.'s teachers, other District officials, and AM's evaluating physicians testified.  Also among the witnesses was Juli Unger Hancock, whom the DPHO qualified as an expert in educational diagnostics.  Unger Hancock testified that A.M.'s ADHD was interfering with his educational performance; that A.M.'s presentation was consistent with that of a student with emotional disturbance, a disability defined under the IDEA; and that A.M. was not merely socially maladjusted.

On January 17, 2012, the DPHO issued a decision on A.M.'s petition.  As an initial matter, the DPHO found that the District complied with the "child find" procedures set forth in the IDEA by identifying and evaluating A.M. for suspected ADHD  – a condition that, where certain factors are present,[5] constitutes an "other health impairment" requiring the administration

---

[5]Pursuant to IDEA, "other health impairment" is defined as:

[H]aving limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that --
(i) Is due to chronic or acute health problems such as . . . attention deficit disorder or attention deficit hyperactivity disorder . . .; and
(ii) Adversely affects a child's educational performance.

34 C.F.R. § 300.8(c)(9).

of special education services under the IDEA.  However, the DPHO found that the District failed

to meet its "child find" duty to identify and evaluate A.M. for another disability under the IDEA,

"serious emotional disturbance, upon which there was notice of behaviors likely to indicate a

disability showing a suspicion of the disability."  (AR at 295).

Next, the DPHO concluded that A.M. "is a child with a disability based on a serious

emotional disturbance and other health impairment [ADHD]," and was in need of special

education services designed to meet his needs on both fronts.  *Id.* at 295-96 (citing 34 C.F.R. §

300.8(a)).  With respect to A.M.'s ADHD, the DPHO concluded that, while the District had met

its procedural "child find" duty to evaluate whether the condition was so impairing as to

constitute a disability within the meaning of the IDEA, it erred in concluding that ADHD did not

render A.M. disabled.  The DPHO  found that A.M. required special education services for his

disability, and that the District's failure to create an IEP reasonably calculated to enable him to

receive meaningful educational benefits was a violation of A.M.'s right to a FAPE.

With respect to emotional disturbance, the DPHO noted:

Over a long period of time and to a marked degree that adversely affected the
Student's educational performance, both singularly and in a combination, the
Student was: unable to learn not explained by health, intellectual or sensory
factors; unable to maintain or to build satisfactory interpersonal relationships with
peers or teachers; had behaviors or feelings which were inappropriate under
normal circumstances; had a persuasive [sic] mood of unhappiness or depression;
and had a tendency for development of physical symptoms or fears which are
associated with personal or school problems.

*Id.* at 296.  The DPHO found that A.M. also required special education services for emotional

disturbance, and that the District's failure to provide them violated his right to a FAPE.

The DPHO denied Morrison's request for compensatory education (in the form of 200

hours of direct instruction and tutoring), noting that "subsequent placement may remedy the

prior violation." *Id*. at 298.

On December 14, 2012, Morrison filed a Complaint in this Court pursuant to the IDEA, 20 U.S.C. § 1415(i)(3), seeking an award of attorneys' fees and costs incurred in bringing the administrative action. Morrison did not challenge any of the DPHO's conclusions of law, including his finding that her request for compensatory education be denied.

On December 16, 2012, the District filed a Complaint against Morrison, seeking appellate review of the DPHO's final decision.

On April 23, 2013, the Court consolidated the instant actions.

## STANDARDS OF REVIEW

### I. <u>Educational Requirements Imposed by the IDEA</u>

#### A. The IDEA Framework

"The IDEA is a comprehensive statute enacted to ensure that all children with disabilities have access to a free and appropriate public education [FAPE] designed to meet their unique needs." *Murray v. Montrose County Sch. Dist.,* 51 F.3d 921, 925 (10th Cir. 1995) (quotations omitted). Pursuant to the IDEA, the federal government provides grants to states, which the states then provide to local educational agencies to assist in the provision of educational services to children with disabilities. *See Fowler v. Unified Sch. Dist. No. 259*, 107 F.3d 797, 801 (10th Cir. 1997). Central to the IDEA is the requirement that local school districts that receive such grants develop, implement, and annually revise an individualized education program ("IEP") calculated to meet the eligible student's specific educational needs. 20 U.S.C. § 1414(d). "The IDEA contains both procedural requirements to ensure the proper development of an IEP, and substantive requirements designed to ensure that each child receives a FAPE." *L.B. v. Nebo*

13

*School Dist.*, 379 F.3d 966, 974 (10ᵗʰ Cir. 2004).

**B.      The "Child Find" Obligation**

Before a child can be eligible for an IEP, he must first be identified as eligible for special

education services as a child with a disability.  *See* 20 U.S.C. § 1414(d)(1)(A).  Accordingly, a

central tenet of the IDEA is the so-called "child find" obligation, pursuant to which "[a]ll

children with disabilities . . . . , regardless of the severity of their disabilities, and who are in

need of special education and related services, are [to be] identified, located, and evaluated."  *Id.*

§ 1412(a)(3)(A).  The "child find" obligation "imposes an affirmative obligation of the school

district," that "is triggered when the school has reason to suspect a disability, and reason to

suspect that special education services may be needed to address that disability."  *Weisenberg v.*

*Bd. of Educ. of Salt Lake City School Dist., et al.*, 181 F. Supp. 2d 1307, 1310-11 (D. Utah

2002) (quotation omitted).  "Knowledge of a disability may be inferred from written parental

concern, the behavior or performance of the child, teacher concern, or a parental request for an

evaluation."  *Id.* at 1311 (citing 20 U.S.C. § 1415(k)(8)(B)(i-iv).

**C.      Administrative Review of IDEA Claim**

The IDEA provides that a student who wishes to challenge the appropriateness of his IEP

" must exhaust IDEA's impartial due process hearing procedures" before he can bring a civil

action in federal court.  *See Cudjoe v. Indep. Sch. Dist. No. 12*, 297 F.3d 1058, 1063 (10th Cir.

2002) ("if a student with a disability seeks to bring a claim for educational injuries, then he must

plead and show either that he has exhausted his administrative remedies under the IDEA or that

the relief he is seeking is not available under the IDEA"); *Assoc. for Community Living v.*

*Romer,* 992 F.2d 1040, 1043 (10th Cir. 1993)("Judicial review under 20 U.S.C. § 1415(e)(2) is

normally not available until a plaintiff has exhausted the administrative remedies provided under

§ 1415(b)(2) and (c).").  Pursuant to the IDEA, a petitioner parent seeking a determination as to

whether his or her child has been denied a FAPE must file a complaint with the State or local

educational agency, following which "the parents involved in such complaint shall have an

opportunity for an impartial due process hearing, which shall be conducted by the State

educational agency."  20 U.S.C. § 1415(f)(1); *see also* N.M. ADMIN. CODE TIT. 6.31.2.13 §

I(3).  At the adversarial hearing, the parent and the school district will then have an opportunity

to present their positions "before a hearing officer, after which the hearing officer issues a

written decision adjudicating the parent's claim.  Following an appeal to an administrative panel.

The federal district court may properly review the hearing officer's decision."  *L.C. v. Utah State*

*Bd. of Educ.,* 125 Fed. Appx. 252, 255 (10th Cir. 2005).


## II.   <u>Review of Agency Disposition of IDEA Petition</u>[6]

"The IDEA provides the federal courts with a unique standard of review that differs from

[the] typical deferential review of administrative proceedings."  *Systema v. Academy School*

*Dist. No. 20*, 538 F.3d 1306, 1311 (10th Cir. 2008). "Rather than employing the substantial

evidence standard typically used when reviewing an administrative agency decision, the court

---

[6]While the District has styled the instant motion as a motion for summary judgment,
'[b]ecause the IDEA requires a district court to grant judgment on the record based on its own
ascertainment of the preponderance of the evidence . . . [s]uch motions . . . are better understood
as motions for judgment on the administrative record," rather than motions for summary
judgment asking the court to determine whether there exist genuine issues of material fact.  *J.P.*
*v. Enid Pub. Sch.*, 2009 U.S. Dist. LEXIS 87813, at *3-*4 (W. Dist. Okla., Sept. 23, 2009); *see*
*also L.C.,* 125 Fed. Appx. at 255 (district court's judgment on agency record "is best termed a
judgment on the administrative agency's record and not a grant of summary judgment")
(quotation omitted); *L.B.,* 379 F.3d at 974 (same); *M.M v. Unified Sch. Dist. No. 368,* 2008 U.S.
Dist. LEXIS 93945 at *24 (Dist. Kan., Nov. 18, 2008) (pretrial resolution of IDEA appeals is
appropriate in the Tenth Circuit, though "[s]uch resolution is not summary judgment, but rather a
determination based on the administrative record").

must decide independently whether the requirements of the IDEA are met." *L.C.,* 125 Fed.

Appx. at 255 (quotation omitted).  The district court must, however, give "due weight"[7] to the

hearing officer's findings of fact, which are considered prima facie correct, and "grant a

judgment on the record based on its own ascertainment of the preponderance of the evidence."

*L.B.*, 379 F.3d at 974.  The provision that the district court base its decision on the

"preponderance of the evidence" is "by no means an invitation to the courts to substitute their

own notions of sound educational policy for those of the school authorities which they review."

*Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 206 (1982); *see also*

*O'Toole by & Through O'Toole v. Olathe Dist. Sch. Unified Sch. Dist. No. 223,* 963 F. Supp.

1000, 1009 (D. Kan. 1997) ("The very importance which Congress has attached to compliance

with certain procedures in the preparation of an IEP would be frustrated if a court were permitted

simply to set state decisions at nought") (quotation omitted).  This approach has been dubbed

"modified de novo review" by the Tenth Circuit.  *See Erickson v. APS*, 199 F.3d 1116, 1120 (10th

Cir. 1999).

    Thus, the district court's inquiry in suits brought under the IDEA "is twofold.  First, has

the State complied with the procedures set forth in the Act?  And second, is the individualized

---

    [7]While the Tenth Circuit has not defined "due weight," three other circuits have
attempted to shed some light on this "amorphous standard."  *See Weisenberg*, 181 F. Supp. 2d at
1310 n.1.  While the First Circuit concluded that "due weight" means less deference than would
be given under the "substantial evidence" standard, it also directed that "consideration should be
given to the fact that the [DPHO] has had the opportunity to observe the demeanor of the
witnesses."  *Fort Zumwalt Sch. Dist. v. Clynes*, 119 F.3d 607, 610 (8th Cir. 1997).  In *Hartmann
v. Loudoun Cty. Bd. of Educ.*, the Fourth Circuit held that since "administrative findings in an
IDEA case are entitled to be considered prima facie correct . . . the district court, if it is not going
to follow them, is required to explain why it does not."  118 F. 3d 996, 1000-01 (4th Cir. 1997).
Finally, the First Circuit opined that a district court's decision, while "independent by virtue of
being based on a preponderance of the evidence before the court" is necessarily "bounded by the
administrative record."  *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 990 (1st Cir. 1990).

educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?"  *O'Toole*, 963 F. Supp. at 1009.

At all times, "the burden of proof in these matters rests with the party attacking the child's individual education plan."  *Johnson v. Indep. Sch. Dist.* No. 4, 921 F.2d 1022, 1026 (10th Cir. 1990).

## DISCUSSION

### I.   Whether the District Met its "Child Find" Obligation With Respect to "Emotional Disturbance"

The District proffers several arguments as to how the DPHO erred in finding that it violated A.M.'s right to a FAPE by failing to identify and evaluate him for emotional disturbance.  The Court takes up each of the District's  arguments in turn.

#### A.   Whether a "Child Find" Claim is Cognizable at Law

First, the District contends that "the plain language" of the "child find" provision – which provides that a local educational agency must provide written notice to a child's parents whenever it "proposes to initiate or change" or "refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to the child," 20 U.S.C. § 1415(b)(3); *see also* 34 C.F.R. § 300.503(a); N.M. Code R. § 6.31.2.13(D)(2) – does not provide for a private cause of action.  According to the District, the statutory language plainly "presuppose[s] that there had been purposeful action with regard to a specific student, before any 'refusal' occurred."  (Doc. 29 at 14).  The District's position is adopted from the only authority it cites in support of its position, a dissenting opinion in *Compton Unified Sch. Dist. v. Addison*, 598 F.3d 1181, 1188 (9th Cir. 2010) (dissent concluding

that "refusal" obviously references "purposeful agency action in response to a conflict"). Though the District does not elaborate on its position further, it appears to suggest that, because its history of conflicts with Morrison did not specifically include a debate over whether A.M. should be identified as suffering from "emotional disturbance" as defined by the IDEA, the DPHO erred in finding that it violated its "child find" obligation.

The Court finds no support in the case law for the District's position, which appears to be firmly at odds with the Supreme Court's warning that "[a] reading of the [IDEA] that left parents without an adequate remedy when a school district unreasonably failed to identify a child with disabilities would not comport with Congress' acknowledgment of the paramount importance of properly identifying each child eligible for services." *Forest Grove Sch Dist. v. T.A.,* 557 U.S. 230, 245 (2009). Indeed, courts have consistently recognized claims based on a school district's failure to identify or evaluate a student's disability, even where the school district did not affirmatively refuse the parent's express request that it evaluate the child for the disability in issue. *See Weisenberg*, 181 F. Supp. 2d at 1311 ("Knowledge of a disability [for purposes of finding a "child find" violation] may be inferred from . . . the behavior or performance of the child") (denying summary judgment to school district on parent's claim that district failed to "find" student, where parent did not contend that student suffered from a particular disability, but rather argued that district had reason to suspect need for special education based on student's records and verbal interactions with school staff); *Bd. of Educ. of Fayette Cnty., Ky. v. L.M.,* 478 F.3d 307, 313 (6th Cir. 2007) (in order to establish a procedural "child find" violation, parent "must show that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate"). As the *Compton* majority noted, the jurisdictional requirements for an IDEA complaint, set forth

at 20 U.S.C. 1415(b)(6)(A), clearly state that a petitioner may bring a complaint "with respect to *any matter* relating to the identification, evaluation, or educational placement of the child. . . . .It is a well-established principle of statutory construction that legislative enactments should not be construed to render their provisions mere surplusage." *Compton,* 598 F.3d at 1184 (quotation omitted); *see also id.* (noting that even assuming *arguendo* that IDEA claims may only be brought over affirmative refusals to initiate a change, a school district's "deliberate indifference" would still constitute an affirmative refusal).

Accordingly, the Court finds that the DPHO did not err on this basis.[8]

### B.      Whether it Would Have Been Reasonable to Suspect Emotional Disturbance

Next, the District argues that the "child find" duty was never triggered with respect to possible emotional disturbance, because it was not reasonable to evaluate A.M. for the disability. *See Weisenberg*, 181 F. Supp. 2d at 1311 ("child find" obligation "is triggered when the school has reason to suspect a disability, and reason to suspect that special education services may be needed to address that disability."). The District contends that the administrative record shows that A.M.'s "behaviors were not unusual or atypical for the most part," (Doc. 29 at 17), and notes that none of the psychological evaluations performed prior to the due process hearing

---

[8]Perhaps relatedly, the District suggests in vague fashion that Morrison cannot establish a "child find" violation because the IDEA "only require[s] that the District establish polices and procedures [to identify and evaluate students] and nothing more. . . . [Morrison] never contended that the District did not have in place policies and procedures to identify and evaluate its students and has not presented such procedures." (Doc. 34 at 10-11). The only authority the District cites in support of this position is the *Compton* dissent. *Id.* at 11 (quoting dissent's contention in *Compton,* 598 F.3d at 1189-90, that parent "never contended that California failed to have these procedures in place"). Because the District does not explain its position – even after Morrison's response that "this argument is hard to respond to because it does not make much sense" (Doc. 33 at 31) – the Court will not scrutinize the *Compton* dissent in an attempt to discern what might have been the District's intended argument.

specifically diagnosed A.M. with emotional disturbance as defined by the IDEA.  Morrison

responds, *inter alia*, that, as early as 2005, the District's own evaluator, Bradley-Askren, found

that A.M. was exhibiting certain criteria for emotional disturbance, and that the District ignored

its obligation to continue to monitor him for possible emotional disturbance as his emotional

state continued to decline, though "knowing that A.M. was increasingly depressed and

expressing suicidal thoughts, anxious, unable to cope and missing valuable instruction time as a

result."  (Doc. 33 at 33).

> "Emotional disturbance" is defined in the IDEA as:
>
> [A] condition exhibiting one or more of the following characteristics over a long
> period of time and to a marked degree that adversely affects a child's educational
> performance:
>
> (A) An inability to learn that cannot be explained by intellectual, sensory, or
> health factors.
>
> (B) An inability to build or maintain satisfactory interpersonal relationships with
> peers and teachers.
>
> (C) Inappropriate types of behavior or feelings under normal circumstances.
>
> (D) A general pervasive mood of unhappiness or depression.
>
> (E) A tendency to develop physical symptoms or fears associated with personal or
> school problems.

34 C.F.R. § 300.8(c)(4).  Accordingly, the petitioner must demonstrate that the child has "(1)

exhibited one of the five listed symptoms, (2) over a long period of time, (3) to a marked degree,

and that his condition adversely affects his educational performance."  (AR at 277) (quoting

*Springer v. Fairfax County Sch. Bd.*, 134 F.3d 659, 663 (4th Cir. 1998) (internal marks omitted)).

"The term does not apply to children who are socially maladjusted, unless it is determined that

they have an emotional disturbance" in addition to the social maladjustment.  34 C.F.R. §

300.8(c)(4)(ii).[9]

In finding that the District was on notice of behaviors likely to indicate emotional disturbance, which it subsequently ignored, the DPHO noted, *inter alia,* that (1) as early as A.M.'s second-grade year, the District's expert, Bradley-Askren, found that he displayed certain "clinical behaviors which could fit" the definition of serious emotional disturbance, (*id*. at 282); (2) Bradley-Askren's 2009 re-evaluation noted her earlier finding that A.M. met certain emotional disturbance criteria, yet she did not proceed to reassess him specifically for emotional disturbance, (*id.* at 283); (3) A.M. was being bullied by peers and experiencing suicidal thoughts, heightened emotional sensitivity, anxiety, depression, and inattention in early 2009; and (4) Williams' May 2009 evaluation found that A.M.'s deficits were interfering with his ability to get the most of his education, and that intensive intervention was needed.

The Court finds the DPHO's ruling that the District failed in its affirmative duty to evaluate A.M. for possible emotional disturbance is supported by more than a preponderance of the evidence.  At the time of his only "emotional disturbance" evaluation in 2005  – seven years before the due process hearing – the District's psychologist, Dr. Bradley-Askren, found that he was displaying clinical behaviors indicative of emotional disturbance.  However, she stopped short of diagnosing A.M. as emotionally disturbed in light of her findings that (1) A.M.'s behavioral problems had yet to adversely affect his educational performance, (2) A.M. had not

_____

[9]Neither the IDEA, the implementing federal regulations, nor New Mexico's special education regulations define "educational performance."  *See* NMAC 6.31.2.1, et seq.  As the DPHO noted, however, the NMPED's *Technical Evaluation and Assistance Manual* "characterizes the phrase 'adversely affects educational performance' as not limited to academic performance. . . . Each case is to be evaluated independently . . . factual review of an adverse impact on educational performance will look at more than only academic grades and testing performance."  (AR at 278-9, n.7) (citation omitted).

shown an "[i]nability to build or maintain appropriate relationships with peers and teachers exhibited over a long period of time," (AR at 1033); (3) the physical symptoms A.M. had exhibited did not rise to the level of being problematic; (4) it was inconsistent between his raters whether A.M.'s inappropriate behaviors existed "to a marked degree" (*id.*); and (5) A.M. did not, at the time of the evaluation, self-report the clinical level of depression that his raters believed him to be experiencing. In other words, as of 2005, A.M. had not exhibited any of the characteristics of emotional disturbance "over a long period of time and to a marked [enough] degree" that his educational performance was yet affected.

Contrary to the District's suggestion, however, its obligation to evaluate A.M. for emotional disturbance was not rendered moot by its one-time evaluation in 2005. On the contrary, the record shows that A.M.'s characteristics of emotional disturbance only worsened over time, as evidenced by his increasing difficulties with completing tasks and maintaining attention in the classroom; increasing isolation in school, culminating in reports of bullying by his peers; repeated diagnoses of anxiety and depression from both District and independent evaluators; and expression of suicidal thoughts beginning in 2009. While Morrison did not specifically raise the specter of A.M.'s possibly suffering from emotional disturbance as defined in the IDEA in any of her petitions to the District, the Court finds that her repeated expressions of concern and requests for a special-education evaluation, in combination with A.M.'s behavior and the diagnoses of both his independent evaluators and Dr. Bradley-Askren, were sufficient to put the District on direct notice that A.M. should be identified and evaluated for possible emotional disturbance. *See Weisenberg*, 181 F. Supp. 2d at 1311 ("Knowledge of a disability may be inferred from written parental concern, the behavior or performance of the child, teacher concern, or a parental request for an evaluation") (citing 20 U.S.C. § 1415(k)(8)(B)(i-iv)).

**C.      Whether A.M.'s Ineligibility for Special Education Renders the "Child Find" Provision Moot**

Finally, the District suggests that "there can be no 'child find' violation if [a] student is not eligible for special education."  (Doc. 29 at 19).  In support of its position, the District cites, but does not discuss, *D.G. v. Flour Bluff Indep. Sch. Dist.*, 481 Fed. Appx. 887 (5th Cir. 2012). In *D.G.*, the Fifth Circuit considered, in the absence of any apparent precedent, "whether a school district can be liable for a ["child find"] violation if the student is not eligible for IDEA special education." *Id.* at 891.  The court ultimately concluded that the student could not recover attorneys' fees for a school district's failure to evaluate him for potential disability, where the student was later determined to have been ineligible for special education during the relevant time period.   Here, by contrast, the Court finds that A.M. was both emotionally disturbed within the definition of the IDEA and eligible for special education services on account of his disability. S*ee discussion infra* at 30-34.  Consequently, the Court need not further analyze the question of whether a school district may be liable for failing to evaluate a student for a disability for which he is later determined not to require special education

Therefore, for the reasons set forth above, the Court finds that the District violated its "child find" duty to identify and evaluate A.M. for emotional disturbance.

**II.      Whether A.M. Was Eligible for Special Education for ADHD**

Next, the District contends that the DPHO erred in finding that A.M.'s ADHD met the criteria for "other health impairment," a disability under the IDEA; and, further, that even if it did meet the criteria, A.M. did not need to receive special education services by reason thereof. The Court disagrees, and concludes that the DPHO correctly decided that A.M. is eligible for an

IEP designed to meet his needs as a student with disabling ADHD.

### A.  A.M.'s ADHD as "Other Health Impairment"

It is undisputed that A.M. has suffered from ADHD since at least the time of his first evaluation by the District in 2005.  However, ADHD only rises to the level of "an other health impairment" constituting a disability under the IDEA when certain factors are present – specifically, where the ADHD (i) causes the student to "hav[e] limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment," and (ii) "[a]dversely affects [the student's] educational performance."  *See supra* n. 5.

The District devotes one paragraph to its argument that ADHD did not render A.M. disabled under the IDEA, noting that (1) the District's 13-member Multidisciplinary Evaluation Team found in October 2009 that A.M.'s educational performance was not adversely affected by his condition (so that A.M. did not meet the second prong of the "other health impairment" test); and (2) the DPHO relied heavily on the testimony of A.M.'s independent evaluators, Drs. Williams, Freedle, and Sims, none of whom personally observed him in the classroom. Morrison responds that the record is replete with evidence that A.M. experienced difficulty attending in class and completing assignments, and that the District's own Behavior Specialist, Deborah Coker, who did observe A.M. in the school setting, noted how he frequently exhibited certain hallmarks of ADHD in the classroom – such as "blurting out comments, concerns about grades, rocking back and forth in desk, making snapping sounds, taps finger on teeth, rubs face and head," (Doc. 33 at 12) (citing AR at 316-46) – which interfered with his social progress by isolating him from his peers.

The Court finds that the record supports the DPHO's conclusion that A.M.'s ADHD

24

qualifies as an "other health impairment" under the IDEA.  The District does not dispute that

A.M. meets the first criterion for "other health impairment" – limited alertness in the classroom

environment attributable to the impairment in issue.  In addition to the behaviors observed by

Coker at his Functional Behavioral Assessment in January 2011, A.M. was found by the

District's Recreational Therapist, Tom House, to have difficulties following directions, despite

his above-average cognitive abilities, in January 2009; was noted by Dr. Williams – who

reviewed and specifically cited information obtained from A.M.'s teachers -- to have difficulties

with mental flexibility, self-monitoring, attending to instructions, fidgeting, listening in class,

and sustaining attention to lessons, in May 2009; fidgeted with a toy during his second District

evaluation in October 2009; experienced problems with focusing, self-regulation and coping

with stress at the time of his evaluation by Dr. Freedle in April 2010; and was determined by his

treating psychologist, Dr. Sims, to have "a sense of hopelessness regarding his ability to meet

academic and social expectations unless he receives more individual attention and instructional

techniques as previously recommended" in June 2010.  (AR at 388).

Thus, the question to be answered is whether A.M.'s ADHD met the second "other health

impairment" prong by adversely affecting his educational performance.  As the DPHO correctly

noted, in New Mexico, "the phrase 'adversely affects educational performance' [is] not limited

to academic performance. . . . [F]actual review of an adverse impact on educational performance

will look at more than only academic grades and testing performance."  (AR at 278-9) (citing

*Letter to Clarke*, 48 IDELR 77, 107 LRP 13115 (OSEP March 8, 2007)); *see also Mr. I., as*

*Parent and Next Friend of L.I. v. Maine Sch. Admin. Dist. No. 55*, 480 F.3d 1, 12 (1st Cir. 2007)

(a "broad definition of 'educational performance' squares with the broad purpose behind the

IDEA: to ensure that all children with disabilities have available to them a free and appropriate

public education that emphasizes special education and related services designed to meet their

unique needs.") (internal quotation omitted).

In this case, the record strongly suggests that District officials considered A.M.'s

educational performance solely through the prism of his passing grades and above-average test

scores in concluding that his educational performance was not adversely affected by ADHD.

Indeed, in finding A.M. ineligible for special education services, the District's Multidisciplinary

Evaluation Team found that he "present[ed] functional deficits" that "impact his performance in

all environments and affect[] his ability to complete tasks, self-care tasks, productivity, and

leisure participation," yet went on to conclude that "[b]ased on formal assessments and short

cycle assessment . . . student is performing at or above grade level.  This is not impacting

[A.M.'s] education."  (AR at 942); *see also* Doc. 34 at 7 (District contending that "[i]f A.M.'s

educational performance was being adversely affected by his alleged disabilities[,] then certainly

his grades would have suffered as well").  The District's tendency to conflate "educational

performance" with academic progress and/or intellectual ability is underscored by its

discontinuing A.M.'s special education services – which were designed in part to address his

difficulties with maintaining attention in class and exhibiting appropriate social behavior -- upon

his identification for services as a gifted student in 2006 (though the District did not

subsequently reinstate his IEP upon finding A.M. ineligible for gifted services in 2009).

The Court agrees with the DPHO that – even attributing A.M.'s pattern of frequent visits

to the school nurse's office and increasing absences from school to the effect of his emotional

disturbance, rather than ADHD – ADHD itself adversely affected A.M.'s educational

performance.  With regard to his academic progress, A.M.'s sixth-grade teacher testified at his

due process hearing that she experienced "more difficulty" with him after he was exited from

special education (Tr. Vol. II at 136:1-136:4), and that he would become agitated in the classroom and refuse to complete in-class assignments. Dr. Williams also relied upon teachers' records in noting how A.M.'s manifestations of ADHD – including fidgeting, failing to sustain attention to tasks, leaving his seat, avoiding projects which required sustained mental effort, and a reduced ability to modulate his behavior – affected both his ability to complete his classwork *and* his ability to interact with his peers. Williams' view was further supported by the testimony of Drs. Freedle and Sims, as well as educational diagnostics expert Julie Unger Hancock, that A.M.'s ADHD "affect[ed] his completion of work, his behaviors, and his interactions with his classmates." (Tr. Vol. III at 178:18-178:20); *see also* AR at 325-31 (District's Functional Behavior Assessment describing how other students are "put off" by A.M.'s repeated comments and questions to the teacher, and singing and muttering gibberish to himself in class).

There is also evidence in the record that these same ADHD behaviors that alienated A.M. from his peers likewise influenced his non-special-education teachers' view of him, thus isolating him further in the school environment. *See, e.g.*, AR at 322-24 (A.M.'s sixth-grade teacher commenting that he "gives up easily"; "is capable of doing the work but often shuts down"; "overreact[ed]" when he asked to see her in the hall to describe his classmates' making fun of him, which the teacher acknowledged not witnessing; and "seems to believe that everyone is here to serve him . . . because when everyone else is finished he wants the class to wait for him," and "doesn't seem to know how to be a friend. He has difficulty maintaining self-control.").

Accordingly, the Court finds that ADHD adversely affected A.M.'s educational performance with regard to both his academic and social progress.

**B. A.M.'s Special Education Eligibility**

Second, the District contends that, even if A.M.'s ADHD constituted an "other health impairment" under the IDEA, he still did not need special education services.  *See* 20 U.S.C. § 1401(3)(A) (noting that, to qualify for special education services, a student must both have a qualifying disability and "by reason thereof, need[] special education and related services.").  In New Mexico, a child "demonstrates a need for special education and related services" where his disability requires him to receive "specially designed instruction in order to:

> (a) be involved in and make progress in the general education curriculum. . . .;

> (b) participate in extracurricular and other nonacademic activities; and/or

> (c) be educated and participate with other children with disabilities and nondisabled children.

*New Mexico Public Education Department Team Technical Evaluation and Assessment Manual: Determining Eligibility for IDEA Part B Special Education Services*, at 26 (July 2011).  In determining whether a student has a need for special education services, the Court must evaluate the unique facts and circumstances of the case in issue, by considering "a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations, as well as information about the child's physical condition, social or cultural background, and adaptive behavior. . . . .".  34 C.F.R.§ 300.306(c)(1)(I) (outlining procedures for determining "eligibility and educational need").

The District likens this case to other cases in which a court found that a student with ADHD did not need special education because the student "was performing well academically." (Doc. 29 at 25) (citing *Alvin Indep. School Dist. v. A.D.*,  503 F.3d 378 (5th Cir. 2007); *D.G. v. Flour Bluff Indep. Sch. Dist.,* 481 Fed. Appx.  887 (5th Cir. 2012)).  The Court finds both Fifth

Circuit cases cited by the District distinguishable from the instant case.  In *Alvin*, the court affirmed a district court's decision that an ADHD-afflicted child, A.D., did not need special education after noting "that the district court properly considered evidence of A.D.'s *academic, behavioral,* and *social* progress," including the fact that he "was achieving social success" with his peers in school.  *Alvin,* 503 F.3d at 385 (emphasis added).  Similarly, in *D.G.*, the Fifth Circuit upheld the denial of special education services to a student where the record showed that he "was academically and behaviorally successful" for four straight years after his initial diagnosis with ADHD, and, further, that his "behavioral problems were not due to any mental or physical health condition, but rather that D.G. was cynical, unwilling to accept responsibility, and was reinforced in this behavior by a parent."  *D.G.,* 481 Fed. Appx. at 892-93.

In this case, in marked contrast to *Alvin* and *D.G.*, the record shows that multiple aspects of A.M.'s educational performance were adversely affected by ADHD, as manifested in his difficulties focusing in the classroom, failure to complete class assignments, disruptive behavior, and inability to connect or participate with other children.  A variety of sources – including District assessments; parent input; the comments of A.M.'s teachers, including testimony that he became more difficult and agitated in class when his special education services were discontinued; reports of several years' of disruptive in-class behavior and isolation from peers; and the testimony of A.M.'s treating psychologist and an educational diagnostics expert – support the finding that A.M. is in need of special education services targeted to his disability.

Accordingly, the Court finds that the DPHO's finding that A.M. required special education for his ADHD is supported by a preponderance of the evidence.

29

**III.     Whether A.M. Was Eligible for Special Education for Emotional Disturbance**

The District further contends that the DPHO erred in finding that (1) A.M. suffered from "emotional disturbance" as defined by the IDEA, and (2) that he needed to receive special education services by reason thereof.

**A.  A.M. Met the Criteria for "Emotional Disturbance"**

As set forth above, a student is deemed to suffer from emotional disturbance within the meaning of the IDEA when he exhibits one or more of five listed symptoms "over a long period of time and to a marked degree that adversely affects [the student's] educational performance." 34 C.F.R. § 300.8(c)(4)(ii).  The DPHO concluded that A.M. exhibited, to a marked degree and over a long period of time, all five of the symptoms of emotional disturbance: (1) an inability to learn not explained by health, intellectual or sensory factors; (2) inability to maintain or to build satisfactory interpersonal relationships with peers or teachers; (3) behaviors or feelings which were inappropriate under normal circumstances; (4) a pervasive mood of unhappiness or depression; and (5) a tendency for development of physical symptoms or fears which are associated with personal or school problems.  (AR at 296).

The District does not dispute that there is evidence in the record showing that A.M. exhibited "the characteristics of being emotionally disturbed," (Doc. 29 at 22), and, indeed, the record is replete with evidence that A.M. experienced anxiety and depression; had difficulty modulating his behavior and making friends; experienced bullying by his peers over a period of several years; disclosed suicidal thoughts to District employees and treating physicians; and developed a pattern of frequently visiting the school nurse's office and taking absences from school on account of headaches and stomach cramps that appeared to be associated with social anxiety.  Moreover, the District does not dispute that A.M. displayed such symptoms "over a

30

long period of time," which the U.S. Department of Education Office of Special Education Programs ("OSEP") defines as "a range of from two to nine months, assuming preliminary interventions have been implemented and proven ineffective during that period."  (AR at 782-83) (citation omitted).

Thus, the District argues solely that A.M. was not disabled under the IDEA because he did not exhibit any symptom of emotional disturbance "to a marked degree that adversely affect[ed] [his] educational performance."  34 C.F.R. § 300.8(c)(4)(ii).  The IDEA and its implementing regulations do not define "to a marked degree" in the context of emotional disturbance.  However, "OSEP takes the position that it generally refers to the frequency, duration, or intensity of a student's emotionally disturbed behavior in comparison to the behavior of peers, and can be indicative of either degree or acuity and/or pervasiveness."  (AR at 783).  Here, the District suggests that A.M.'s symptoms of emotional disturbance were not frequent or intense enough to exist to a marked degree or adversely affect his education.  In support of its position, the District cites two pieces of evidence from October 2009: the finding of the Multidisciplinary Evaluation Team that A.M. was performing at or above grade level, and Dr. Bradley-Askren's report that she observed him on two occasions to "interact satisfactorily with his fellow students in class."  (AR at 1047).

The Court finds that the probative value of the two findings offered by the District is greatly outweighed by evidence in the administrative record that A.M. suffers from emotional disturbance to a marked degree.  As noted, *supra,* at 21-22, District psychologist Bradley-Askren found as early as 2005 that he was displaying clinical behaviors indicative of emotional disturbance, but concluded that his educational performance had yet to be adversely affected, he had yet to show an inability to maintain appropriate relationships with peers and teachers over a

31

long period of time, and he did not (in 2005) self-report a clinical level of depression. The record shows, however, that A.M.'s emotional health only declined further over the next five years, as evidenced by Eisenbrown's reports of behavioral problems and social alienation in 2006; Acklen's report that he was experiencing bullying, emotional sensitivity, and diminished self-esteem in Spring 2009; the Multidisciplinary Team's finding that he was unable to relate to peers in October 2009; Freedle's report that he was unable to cope with stress, crying in class, and expressing suicidal thoughts in Spring 2010; and treating psychologist Sims' findings over the course of 2010 that A.M. was socially withdrawn, his depression was increasing, and he was scratching himself and agitated about ongoing bullying by peers. The Court finds that the evidence thus demonstrates that A.M.'s symptoms of emotional disturbance were sufficiently acute and pervasive as to exist to a marked degree.

Further, the Court disagrees with the District's position that emotional disturbance did not adversely affect A.M.'s educational performance. As it did with his ADHD, the District appears to have conflated A.M.'s "educational performance" with academic grades and test scores in minimizing the effect of his emotional state on his success in school. As noted above, New Mexico takes the view that "educational performance" is not limited to academic performance, and the administrative record contains considerable evidence that A.M.'s social and emotional development were adversely affected by emotional disturbance "over a long period of time," as defined in the IDEA. Moreover, A.M.'s treating psychologist Dr. Sims noted that A.M.'s increasing depression *was* directly affecting his academic performance, both because it caused him to feel hopeless and avoid work, and because of missed instruction time during his visits to the school nurse over the 2009-2010 school year. The DPHO gave heavy weight to Dr. Sims' "skill, education and experience, coupled with his thoughtful demeanor and

comprehensive analysis in answering questions," (AR at 289), and the Court gives appropriate deference to the DPHO's ability to assess witness credibility firsthand.

Accordingly, the Court finds that emotional disturbance adversely affected A.M.'s educational performance with regard to both his academic and social progress.

Because the Court finds that A.M. suffers from emotional disturbance as defined in the IDEA, it need not reach the District's additional argument that he was socially maladjusted.[10] *See Springer*, 134 F.3d at 663 (noting that children who are emotionally disturbed within the meaning of the IDEA may suffer an independent social maladjustment).

### B. A.M.'s Special Education Eligibility

Finally, the District argues that even if A.M. suffers from emotional disturbance, he did and does not need special education services by reason thereof. *See* 20 U.S.C. § 1401(3)(A); *Alvin*, 503 F. 3d at 382. In support of its position, the District again cites the finding of the Multidisciplinary Evaluation Team that A.M. was performing at or above grade level as of October 2009, in addition to Dr. Bradley-Askren's observation that he twice "interact[ed] satisfactorily with his fellow students in class" around this time. (AR at 1047).

The Court finds the evidence cited by the District to be amply outweighed by evidence in the record that A.M. required special assistance for emotional disturbance in order to progress academically and participate with other students. As discussed above, the Multidisciplinary

---

[10]The NMPED directs that socially-maladjusted children who do not <u>also</u> qualify as emotionally disturbed tend to "engage in simple, chronic delinquent behavior," including "breaking rules of social conventions for obvious secondary gain, frequent involvement in the criminal justice system, truancy, running away from home, early sexual promiscuity, and . . . demonstrat[ing] controlled misbehavior depending on the situation and potential gain." *New Mexico Public Education Department Team Technical Evaluation and Assessment Manual: Determining Eligibility for IDEA Part B Special Education Services*, at 90-91 (July 2011).

Team appeared to rely on an improperly narrow definition of "educational performance" when it concluded, without further discussion, that "[b]ehavior and emotions are not interfering with [A.M.] in school." (AR at 943). Indeed, the Team's report did not address any specific reports of A.M.'s emotionally disturbed behavior – which, at that time, already included Williams' report that A.M. confessed to wanting to kill himself and Acklen's report that A.M. described to her how he was experiencing bullying on school grounds, and had been afraid to tell his teacher. Likewise, Bradley-Askren's observations stand in contrast to numerous reports from A.M., his mother, his teachers, and his treating psychologist that A.M.'s pervasive unhappiness and inappropriate social behavior left him unable to maintain relationships with peers, which, in turn, perpetuated the physical symptoms that eventually drove him to frequent the nurse's office and miss significant classroom time. *See, e.g.,* AR at 1047 (Bradley-Askren describing Morrison's report that her son "does not understand when people are mean and what he is to do," and "has difficulty making friends"); *id*. at 324 (A.M.'s teacher commenting that he was socially isolated and "doesn't seem to know how to be a friend"). Moreover, by citing two reports from October 2009 as support for the position that A.M. was ineligible for services targeted to emotional disturbance, the District overlooks the wealth of evidence that A.M.'s emotional state continued to decline after these assessments, which culminated in the anti-suicide intervention staged by the District in September 2010, and increasingly frequent trips to the school nurse' office over the 2009-2010 and 2010-2011 school years.

Accordingly, the Court finds that the DPHO's finding that A.M. required special education services for emotional disturbance is supported by a preponderance of the evidence.

**<u>CONCLUSION</u>**

Therefore, for the reasons set forth above, the Court finds that Los Lunas Public Schools'

and the Board of Directors of Los Lunas Public Schools' *Motion for Summary Judgment* (Doc.

29) is **DENIED.**

 

 

                                         _____

                                     UNITED STATES DISTRICT COURT